**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JAMAR WILSON, )
                                     )      Civil Action No. 14 – 1654
            Plaintiff, )
                                       )      Magistrate Judge Lisa Pupo Lenihan
            v. )
                                         )
SUPERINTENDENT ROBERT )      ECF No. 63
GILMORE, *et al.*, )
                                         )
            Defendants. )

## OPINION

LENIHAN, M.J.

       Currently pending before the Court in this prisoner civil rights action is a Partial

Motion for Summary Judgment (ECF No. 63) filed by Defendants Superintendent

Robert Gilmore and John Doe #3, identified as Captain Stephen Durco. Counsel for

Defendants also moves for summary judgment as to Defendants John Does #4, #5, and

#6, none of whom have been identified and against whom Plaintiff appears to have

abandoned his claims. For the reasons set forth below, the Court will grant Defendants'

Partial Motion for Summary Judgment.

## I.    FACTS AND PROCEDURAL HISTORY

       At some point on September 20, 2014, Plaintiff sustained a fractured right

forearm. (Defs.' Ex. 5, ECF No. 66-1 at 80-89.) The parties disagree, however, as to how

Plaintiff sustained that injury.

On September 20, 2014, Plaintiff, an inmate at SCI-Greene, assaulted another inmate in the yard. (Defs.' Ex. 1,[1] ECF No. 66-1 at 1-7; Defs.' Ex. 2 generally,[2] ECF No. 66-1 at 8-66; Video of fight between Plaintiff and another inmate, Defs.' Ex. 3.) Plaintiff used a weapon (sharpened shank) to stab the other inmate two times. (Defs.' Ex. 1 at 1-2; Defs.' Ex. 2 at 15, 23-24, 29-30, 36, 39, 59.) During the course of the fight, plaintiff punched the other inmate in the face a couple of times with both fists. (Defs.' Ex. 7, Pl.'s Dep. at 10, ECF No. 66-1 at 105.) Plaintiff was given a misconduct for this assault, for which he was found guilty. (Defs.' Ex. 1 at 1-2.) The fight was broken up by several corrections officers. (Defs.' Ex. 2 at 3, 14-15, 19-20, 23, 26-27, 29; Defs.' Ex. 3.) Plaintiff was handcuffed without resistance. (Defs.' Ex. 1 at 1; Defs.' Ex. 2 at 29, 31; Pl.'s Ex. A, Pl.'s Aff. at 1, ECF No. 71-2 at 2; Pl.'s Ex. F, Inmate Grievance 10/8/14 , ECF No. 71-7.)

Plaintiff was escorted from the scene of the fight to Medical by Officer Gillis and Officer Barnhart, who are also named as Defendants in this action. (Pl.'s Responsive

---

[1] Defendants' Exhibit 1 consists of the following documents: Misconduct Report; Disciplinary Hearing Report; Misconduct Hearing Appeal filed by Plaintiff; Program Review Committee's Decision and Rationale; Plaintiff's Appeal to Superintendent Gilmore; Second-Level Appeal Decision.

[2] Defendants' Exhibit 2 consists of the following documents: The Investigative Summary of Plaintiff's Abuse Allegation; Official Inmate Grievance; Initial Review Response; Investigator's Findings and Conclusion; Investigative Insert; Video Review Checklist/Briefing/Debriefing: Unplanned Use of Force dated 9/29/14; Extraordinary Occurrence Report dated 9/20/14; Employee Report of Incident filed by: Captain Durco, Lieutenant Barkefelt, Lieutenant Jenkins, COI Herman Brown, Sargent Efaw, CO Gillis, COI Barnhart, COI P. Kelley, Sargent L. Mitchell, COI Gillespie, COI T. Lewis, and Sargent Koast; Medical Incident/Injury Report; Photographs of the weapon used in assault and photographs of Plaintiff's bite injury to right shoulder, his front, back and hands.

Concise Stmt. ("Pl.'s RCS") at ¶7, ECF No. 70.)  Officer Mitchell also responded to the fight in front of D block and joined Officers Barnhart and Gillis in escorting Plaintiff to Medical.  (Defs.' Ex. 2 at 15.)  A yard camera captured video of the fight and the subsequent escort of Plaintiff and the other inmate to Medical.  (Defs.' Ex. 3.)  Although the video is blurry and of poor quality, it shows Plaintiff and another inmate "tied up" with each other during the fight; correctional officers arriving on the scene, separating the inmates, and placing them in handcuffs; and then both inmates being escorted separately to Medical.  (Defs.' Ex. 2 at 3; Defs.' Ex. 3.)  Plaintiff is the inmate in the video without a shirt on who is escorted from the scene second. (Defs.' Ex. 3; Defs.' Ex. 7, Pl.'s Dep. at 18.)  Due to the type and location of the camera, the video recording does not contain any audio.

Defendants submit that the video of Plaintiff being escorted by Officers Barnhart and Gillis from the yard after the fight and walking to Medical does not reveal anything unusual  or remarkable.  (Defs.' Ex. 3.)  Yet, Plaintiff contends that Officer Barnhart broke his arm shortly after the fight was over and things were under control.  (Pl.'s Ex. A, Pl.'s Aff. at 1; Pl.'s Ex. F.)   Specifically, Plaintiff contends that while he was being escorted to Medical, he was "handcuffed extremely too tight" by Officer Barnhart, and after complaining several times, Officer Barnhart broke his arm while he was handcuffed. [3]   (Pl.'s Aff. at 1 (Ex. A); Pl.'s Ex. F.)

---

[3] The dispute as to whether the walk to Medical was unusual or remarkable is material as to the claims against Officers Gillis and Barnhart, who have not moved for summary

Upon arriving at Medical, Plaintiff was assessed by RN Bruce Pokol, another named Defendant in this action. (Progress Notes, Defs.' Ex. 2 at 55; Defs.' Ex. 5 at 1.) RN Pokol treated Plaintiff for a bite mark on his shoulder (*see* Defs.' Ex. 2 at 55, 66; Defs.' Ex. 5 at 1), that was inflicted by the other inmate during the fight (*see, e.g.,* Defs.' Ex. 2 at 3, 20, 26; Pl.'s Ex. F at 1). RN Pokol's progress notes of Plaintiff's initial medical assessment following the fight indicate that Plaintiff was only treated for a bite mark on his shoulder and "no other injuries [were] voiced or noticed." (Defs.' Ex. 2 at 5 & 55; Defs.' Ex. 5 at 1; Pl.'s Ex. C at 1, ECF No. 71-4.) The parties dispute whether Plaintiff informed RN Pokol during his initial assessment that he sustained an injury to his arm. *Compare* Defs.' Ex. 2 at 5, *with* Pl.'s Exs. A & F. [4]

After he was treated for the bite mark by RN Pokol on 9/20/14, Plaintiff was escorted from Medical to the restricted housing unit (RHU) by Officers Gillis, Barnhart, and Mitchell. (Defs.' Ex. B at 15.) During his intake into the RHU, Plaintiff can be seen on the video (recorded with a hand-held camera) favoring his right arm, and heard expressing to the correctional officer performing the strip search that his right arm hurt. (Video of RHU Intake at 2:57, 3:55, Defs.' Ex. 4.) Corrections officers in the RHU

---

judgment. It is not material, however, to Plaintiff's claims against Defendants Gilmore and Durco whose summary judgment motion is the subject of this Opinion.

[4] Plaintiff maintains that he complained to RN Pokol during the initial assessment about an injury to his arm but it was never documented in order to cover up cruel and unusual punishment. (Pl.'s RCS at ¶27, citing in support Pl.'s Exs. A, C at 4, & F.) Again, this factual dispute is not material to the summary judgment motion filed by Defendants Gilmore and Durco, but is mentioned only to give context to the events giving rise to Plaintiff's claims against Defendants Gilmore and Durco.

noticed plaintiff's discomfort and injury to his arm, and notified the medical

department.[5]   (Video of RHU Intake at 3:30, 5:25, 6:52.)  Plaintiff admits that at no time

during the RHU intake did he allege that any corrections officer caused his injuries or

that any nurse refused to treat his injuries. (Pl's RCS, ¶¶17-18; *see also* Defs.' Ex. 4.)

At all relevant times, Robert Gilmore was the Superintendent of SCI Greene,

where Plaintiff was housed.  The Shift Commander at the time of the inmate fight

involving Plaintiff was Captain Stephen Durco. (Defs.' Ex. 2 at 35.)  Captain Durco was

not present, however, at the scene of the fight, or during the escort of Plaintiff to

Medical, the medical assessment by RN Pokol, and RHU intake. (Pl.'s Dep. at 34.)

Plaintiff was placed in the RHU on 9/20/14 pending completion of an

investigation for possible violations of facility rules.  (Defs.' Ex. 2 at 57.)  After an

investigation, the DOC issued  misconduct charges on 10/1/14.  (Defs.' Ex. 1 at 1.)  A

hearing on the misconduct charges was held on October 8, 2014, at which time Plaintiff

entered a plea of not guilty and read his written version of the facts into the record.

(Defs.' Ex. 1 at 2.)  Other evidence was presented at the hearing by the DOC, at the

---

[5] Plaintiff denies the portion of Defendants' statement that the corrections officers at
RHU intake notified the medical department of his arm injury, but fails to cite to any
documents to support his denial.  *See* Pl.'s RCS at ¶16.  As such, Plaintiff has failed to
properly contest Defendants' Concise Statement of Undisputed Facts ¶16, as required
by Federal Rule of Civil Procedure 56(c).  Therefore, pursuant to Rule 56(e)(2), the Court
considers Defendants' Concise Statement in ¶16 to be undisputed for purposes of the
pending summary judgment motion.  Moreover, the record medical evidence supports
Defendants' statement.  *See, e.g.,* Progress Notes, Defs.' Ex. 5 at 2 (Entry at 21:15 hrs on
9/20/14 indicating RN Earl Blaker visited Plaintiff at his cell door on F Block, assessed
and treated his arm injury, and advised him to complete a sick call slip and be seen on
RHU sick call on 9/22/14).

conclusion of which the Hearing Examination Committee (HEX) determined that a preponderance of the evidence supported the charges against Plaintiff and entered a guilty verdict against him on all charges. (*Id.*) Consequently, HEX imposed sanctions against Plaintiff consisting of 300 days in disciplinary confinement effective 10/1/14, loss of his job, and assessment of the costs incurred by the DOC as a result of the misconduct for two-thirds of the other inmate's medical bills. (*Id.*)

Plaintiff appealed the HEX decision to the Program Review Committee on 10/21/14, which reviewed Plaintiff's appeal on 10/24/14 and sustained the decision of HEX, finding no evidence of a violation of DOC policy or procedures. (Defs.' Ex. 1 at 3-4.) Plaintiff then appealed the decision of the Program Review Committee (Second-Level Appeal) to Superintendent Gilmore on 11/6/14. (*Id.* at 5.) Two days later, on 11/18/14, Superintendent Gilmore denied Plaintiff's appeal. (*Id.* at 6.)

Simultaneous with his appeal of the guilty verdict on the misconduct charges, Plaintiff filed Grievance 531045 on October 8, 2014. (Defs.' Ex. 6 at 1, ECF No. 66-1 at 91.) In that grievance, Plaintiff stated:

> On 9/20/14 at app[r]oximately 1300 hours on D-Block walk, officers John Doe used excessive force on me even though I was not resisting. When they cuffed me I told them they messed my arm/wrist up, while walking toward the RHU, and John Doe on my left [Gillis] said "Sorry to hear that" And then I asked officer John doe to my right [Barnhart] could he please loosen the cuff on my right arm but he ignored me. When we got to medical, [Barnhart] tightened the cuff up even more on my right arm. I cried out in agony and again told both officers and the nurse that they did something to my right arm. They did nothing for my right

arm.  Come to find out, x-rays tooken [sic] on 9/24/14 reveal that my right arm was broken by the excessive force used by the officers. . . .

(*Id.*)  Upon receipt of Grievance 531045, Lieutenant Grego was assigned to the investigation of the allegations of abuse.  (Defs. Ex. 2 at 2.)  Plaintiff was notified on 10/9/14 that the DOC staff required an extension of time to appropriately investigate and respond to his allegations of abuse.  (Defs.' Ex. 6 at 2.)   On November 12, 2014, Plaintiff wrote a request slip to Tracy Shawley, the grievance coordinator, asking why no investigation was taking place.  (Pl.'s Ex. G, ECF No. 71-8.)  Ms. Shawley responded to Plaintiff on November 17, 2014, stating that a notice of investigation/extension was forwarded to him on October 9, 2014, and provided him with a courtesy copy of that notice.  (*Id.*)

During his investigation, Lt. Grego attempted to interview Plaintiff on 12/4/14 regarding his claim of abuse, but according to Lt. Grego, Plaintiff refused to answer any questions because he had already filed this civil rights action in federal court over the corrections officers' alleged use of excessive force.  (Defs.' Ex. 2 at 2.)  Plaintiff disputes this statement, contending instead that no attempt was made to interview him nor was he provided an opportunity to give a written statement with regard to the abuse allegations.  (Pl.' Aff. at 3; Pl.'s Dep. at 37.)

After reviewing Plaintiff's grievance, the video from the VICON camera dated 9/20/14 at 13:05, written statements of staff, Major Leggett's Unplanned Use of Force Checklist, medical reports/records and photographs, and interviewing all persons with

information regarding the incident, Lt. Grego reported his findings and conclusions to David P. Mitchell, Security Captain, on 12/11/14. (Defs.' Ex. 2 at 13-21.) Lt. Grego concluded that Plaintiff's allegations of abuse claim had no merit and was false, and therefore, denied the grievance, based on his finding that excessive force was not used by staff when breaking up a fight involving Plaintiff and placing him in handcuffs. (Defs.' Ex. 2 at 11.) Lt. Grego recommended that his findings be reviewed by a higher authority. Plaintiff was notified on 12/12/14 that his grievance was denied. (Defs.' Ex. 6 at 3.) Subsequently, David P. Mitchell, Intelligence/Security Captain, reviewed Lt. Grego's investigative report and issued an Investigative Summary on 12/16/14, concurring with Lt. Grego's findings. (Defs.' Ex. 2 at 1-6.)

While the investigation of his grievance was ongoing, Plaintiff filed this civil rights action, which was received and docketed by the clerk of court on 12/8/14, against Superintendent Gilmore, Captain Stephen Durco (f/k/a John Doe 3), James Gillis (f/k/a John Doe 1), Joshua Barnhart (f/k/a John Doe 2), Nurse Pokol (f/n/a Jane Doe), and John Does Nos. 4, 5 and 6.

Discovery has now closed and Defendants Gilmore and Durco have filed a Partial Motion for Summary Judgment (ECF No. 63) in their favor on the claims against them which is the subject of this opinion. In that motion, Defendants also request summary judgment in favor of John Does Nos. 4, 5 and 6, as none of those Does have been identified. In support, Defendants have filed their Concise Statement of Undisputed Material Facts (ECF No. 65), Brief (ECF No. 64), and Appendix with

exhibits (ECF Nos. 66, 66-1).  In response, Plaintiff has filed a Responsive Concise Statement of Disputed Material Facts (ECF No. 70), and Memorandum of Law in Opposition (ECF No. 71) with supporting exhibits (ECF Nos. 71-1 to 71-16).  Defendants have filed a Response to Plaintiff's Concise Statement of Undisputed Material Facts (ECF No. 76) along with two exhibits (ECF Nos. 76-1 & 76-2).  Thus, the motion has been fully briefed and is now ripe for disposition.

## II.    LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Nat'l State Bank v. Fed.l Reserve Bank of New York*, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963).  *See also Orsatti v. New Jersey State*

*Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing *Celotex, supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* FED. R. CIV. P. 56(c)(2); *Celotex*, 477 U.S. at 324; *J.F. Feeser, Inc., v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

## III.  DISCUSSION

As a preliminary matter, the Court notes that in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 71) ("Pl.'s Opp'n Mem."), Plaintiff admits that he cannot produce evidence in support of his claims against Defendant Captain Durco, and thus, agrees that Captain Durco is entitled to summary judgment in his favor.  Pl.'s Opp'n Mem. at 2.  Similarly, Plaintiff agrees that summary judgment should be granted in favor of John Does 4, 5 and 6.  *Id.* at 2 & 19. Thus, the Court finds that summary judgment in favor of Defendants Durco and John Does 4, 5 6 is warranted, and will enter judgment in favor of these Defendants.

Accordingly, all that remains for the Court to decide on the pending motion is whether Superintendent Gilmore is entitled to summary judgment.  Plaintiff contends

Superintendent Gilmore violated his civil rights by failing to train, supervise, and discipline the correctional officers at SCI-Greene when he knew they violated DOC policies on investigating allegations of inmate abuse and the use of force and restraints, yet chose to tolerate, encourage, and acquiesced in such conduct. (Pl.'s Opp'n Mem. at 2-4.)

A.   **Section 1983**

In order to "state a claim of liability under §1983, [a plaintiff] must allege that [he] was deprived of a federal constitutional or statutory right by a state actor." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (citation omitted). Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . , subjects, or causes to be subjected, any citizen of the United States of any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Therefore, to state a claim for relief under §1983, Plaintiff must demonstrate both that Superintendent Gilmore acted under color of state law and that a constitutional violation was directly caused by his conduct. *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or

federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Moreover, to establish personal liability against a defendant in a § 1983 action, that defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)); *Rizzo v. Goode*, 423 U.S. 362, 372-73 (1976). Accordingly, individual liability can be imposed under § 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Rode*, 845 F.2d at 1207); *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.1986). "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

### B.    Eighth Amendment Deliberate Indifference

In *Beers-Capitol v. Whetzel,* the court of appeals set forth the proper analysis of a claim for deliberate indifference to prison conditions under the Eighth Amendment, based on the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994). *Beers-Capitol v. Whetzel,* 256 F.3d 120, 130-135 (3d Cir. 2001). In analyzing what type of showing is required to establish deliberate indifference, the Supreme Court "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position should have

known." *Beers-Capitol*, 256 F.3d at 131.  "More specifically, the Court held that 'a prison

official cannot be found liable under the Eighth Amendment for denying an inmate

humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer,* 511 U.S. at 837).  The

court of appeals explained that the "requirement of actual knowledge means that 'the

official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference.'" *Id.*

(quoting *Farmer,* 511 U.S. at 837).  The subjective test will be met if the "official acted or

failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511

U.S. at 842.  An official's knowledge of a substantial risk to inmate safety can be proved

indirectly through circumstantial evidence, i.e., where the risk was obvious.  *Beers-*

*Capitol,* 256 F.3d at 131 (citing *Farmer,* 511 U.S. at 842).  An obvious risk has been found,

for example, in situations where the Eighth Amendment plaintiff presented evidence

that a substantial risk of inmate attacks was longstanding, pervasive, well documented

or expressly noted by prison officials in the past, *see Farmer, id.* at 842-43, or where a

school district and officials maintained a practice, custom or policy of deliberate

indifference to instances of known or suspected sexual abuse by teachers and "the need

for more or different training [wa]s so obvious, and the inadequacy so likely to result in

the violation of constitutional rights," *see Stoneking v. Bradford Area School District,* 882

F.2 720, 725 (3d Cir. 1989) (citing *City of Canton v. Harris,* 489 U.S. 378, 390 (1989)).

Therefore, a plaintiff can succeed on an Eighth Amendment deliberate indifference claim in one of two ways:  By establishing either (1) the supervisor's direct liability, or (2) the supervisor's liability for a deficient policy or practice.  *Beers-Capitol,* 256 F.3d at 135; *Parkell v. Danberg,* ___ F.3d ___, No. 14-1667, 2016 WL 4375620, at *9 (3d Cir. Aug. 17, 2016); *Barkes v. First Corr. Med., Inc.,* 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds* 135 S.Ct. 2042 (2015).[6]   With regard to direct liability, the court of appeals articulated the following test, based on *Farmer* and its prior decision in *Hamilton v. Leavy,* 117 F.3d 742 (3d Cir. 1997):

> To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. *See id.* at 837–38, 114 S.Ct. 1970. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. *See id.* at 842, 114 S.Ct. 1970. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring. *See id.* at 844, 114 S.Ct. 1970.

---

[6] Plaintiff also advances the argument that Superintendent Gilmore is liable under *Monell v. N.Y.C. Dep't of Social Servs.,* 436 U.S. 658 (1978), for failing to investigate or inadequately investigating inmate complaints of corrections officers' misconduct.  (Pl.'s Opp'n Mem. at 8-10.)  This argument lacks merit as *Monell* claims can only be brought against municipalities.

*Beers-Capitol,* 256 F.3d at 133.  Under this method, "a supervisor may be personally

liable under § 1983 if he or she participated in violating the plaintiff's rights, directed

others to violate them, or, as the person in charge, had knowledge of and acquiesced" in

the subordinate's unconstitutional conduct.  *Barkes,* 766 F.3d at 316 (quoting *A.M.,* 372

F.3d at 586) (citing *Baker v. Monroe Twp.,* 50 F.3d 1186, 1190-91 (3d Cir. 1995)).

Allegations of participation or actual knowledge and acquiescence, however, must be

made with appropriate particularity.  *Rode,* 845 F.2d at 1207. *See also Evancho v. Fisher,*

423 F.3d 347, 353 (3d Cir. 2005).

      Where the deliberate indifference claim implicates a supervisor for his deficient

policies or practices, the four-part test articulated in *Sample* provides the analytical

framework:

> The plaintiff must identify a supervisory policy or practice
> that the supervisor failed to employ, and then prove that: (1)
> the policy or procedures in effect at the time of the alleged
> injury created an unreasonable risk of a constitutional
> violation; (2) the defendant-official was aware that the policy
> created an unreasonable risk; (3) the defendant was
> indifferent to that risk; and (4) the constitutional injury was
> caused by the failure to implement the supervisory practice
> or procedure. *Sample,* 885 F.2d at 1118; *Brown v. Muhlenberg
> Twp.,* 269 F.3d 205 (3d Cir.2001).

*Barkes,* 766 F.3d at 317.  "In this Circuit, when a plaintiff seeks to hold a defendant liable

under the Eighth Amendment in his or her role as a supervisor, '*Sample*'s four-part test

provides the analytical structure ..., it being simply the deliberate indifference test

applied to the specific situation of a policymaker.'" *Id.* (quoting *Beers-Capitol*, 256 F.3d at 135).

One way for a plaintiff to establish a supervisory liability claim is by demonstrating that "'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries.'" *Beers-Capitol*, 256 F.3d at 134 (quoting *Sample*, 885 F.2d at 1118). In addition, the plaintiff may also establish a supervisory liability claim by showing that "'the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it.'" *Id.* (quoting *Sample, supra*) (footnote omitted).

"'Failure to' claims – failure to train, failure to discipline, or failure to supervise – are generally considered a subcategory of policy or practice liability." *Id.* (citing Rosalie Berger Levinson, *Who Will Supervise the Supervisors? Establishing Liability for Failure to Train, Supervise, or Discipline Subordinates in a Post Iqbal/Connick World*, 47 Harv. C.R. – C.L. L.Rev. 273, 280 (2012)). *See also Sample,* 885 F.2d at 1116 (recognizing that "'supervision' entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking.").

In his memorandum of law in opposition at 8, Plaintiff acknowledges, and correctly so, that to defeat a motion for summary judgment, a plaintiff alleging deliberate indifference by prison supervisors "must present enough evidence to support the inference that the defendants 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" *Beers-Capitol,* 256 F.3d at 132 (quoting *Farmer,* 511 U.S. at 846).

### 1. <u>Direct Liability</u>

Superintendent Gilmore argues that it is undisputed that he was not present at any time and therefore, had no personal involvement in the alleged constitutional violations.   Plaintiff responds that Superintendent Gilmore's argument must fail because *Canton* established that failure to train, supervise, and discipline may constitute personal involvement if other conditions are met.  (Pl.'s Opp'n Mem. at 11.)  Plaintiff misconstrues the Supreme Court's holding in *Canton*.[7]

From a review of Plaintiff's opposition memorandum and supporting documents, it appears that Plaintiff is not proceeding under a direct liability theory of deliberate indifference, but rather, is proceeding under the policy and practice theory. In any event, there is no evidence in the record to show that Superintendent Gilmore personally participated in the alleged use of excessive force, or that he directed Officers

---

[7] In *Canton*, the Supreme Court examined the degree of fault required to hold a municipality liable for its failure to train its employees.  489 U.S. at 388.  The Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* (footnote omitted).

Barnhart and Gillis to do so, or that he knew of their alleged use of excessive force and acquiesced or tolerated that conduct.[8]  Therefore, the Court turns to the analysis of Plaintiff's deliberate indifference claim under the *Sample* test.

## 2.    <u>Policy or Practice Liability</u>

Under *Sample*, a plaintiff must first identify the policies or practices that he claims are deficient.  In the case at bar, Plaintiff has identified two DOC policies that he claims Superintendent Gilmore failed to employ.  The first policy governs investigating allegations of inmate abuse, and the second one covers the use of force and restraints. Plaintiff contends both policies were so deficient that the risk of a constitutional violation was obvious.   He also contends that Superintendent Gilmore was deliberately indifferent to his constitutional rights when he tolerated, encouraged, and acquiesced to a practice of DOC Policy violations that approximated his injuries.   In addition, Plaintiff argues that Superintendent Gilmore knew the objectively intolerable risk of harm, and had extensive training, but still knowingly and unreasonably disregarded that risk.

As explained below, however, Plaintiff has failed to proffer evidence from which a reasonable jury could find that Superintendent Gilmore was deliberately indifferent to a known or obvious risk of a constitutional violation.

---

[8] Plaintiff's bare allegations of tolerance and acquiesce do not constitute evidence.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)* ("'[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'") (quoting *Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002)*).

### a.      Policy on Investigating of Allegations of
###          Inmate Abuse

The DOC has established a policy and procedures for monitoring and

investigating allegations of inmate abuse.  *See* DOC Policy Stmt. DC-ADM001 dated

3/27/13 (Pl.'s Ex. J, ECF No. 71-11.)  The DOC procedures for investigating allegations

of abuse provide, among other things, that when a grievance dealing with allegations of

abuse is received from an inmate, and it is the first notice made by the inmate, the

grievance coordinator shall issue an Extension Notice to the inmate by checking the box

"Notice of Investigation."  (Procedures Manual, DC-ADM 001 §1.B.2 at 1-1 ("Procedures

Manual"), ECF No. 71-11 at 8.)    The Procedures Manual requires that allegations of

abuse be investigated and an investigative report compiled, and in so doing, requires

the facility Security Office/Bureau of Community Corrections (BCC) to:

> (1)    interview the inmate complainant . . . and obtain an
>        Inmate Written Statement . . . following the interview.
>        If the complainant refuses to be interviewed or
>        provide a written statement, said refusal, including
>        date, time and persons present, shall be documented
>        and included in the investigative report;
>
> (2)    interview all inmate witnesses and obtain an Inmate
>        Written Statement  from the inmate(s) following the
>        interview;
>
> (3)    interview all staff member witnesses and/or potential
>        staff member witnesses and obtain a Staff Written
>        Statement . . . ;
>
> (4)    interview all subject staff members and obtain a Staff
>        Written Statement;

(5)     review all available video footage and save the video footage to a DVD to submit with the investigative report; and

(6)     Review and copy all housing unit log books, medical documentation, work related reports, misconduct reports, inmate grievances and all other pertinent documentation, specific to the allegation of abuse, and include the documentation in the investigative report.

Procedures Manual §1.C.1.c.(1) – (6), at 1-2 to 1-3 (ECF No. 71-11 at 9-10).  In addition, the Procedures Manual requires that the investigative report follow the inmate abuse report format provided by the Office of Special Investigations and Intelligence (OSII) and include the following information:  (1) written statements or grievance of the inmate; (2) all related DC-121's; (3) reports of staff, witnesses and or inmates; (4) written statements of the complainant, witnesses and staff; (5) all relevant medical reports; (6) any related videos or photographs; (7) misconduct reports related to the incident; (8) any other relevant documents; (9) an investigative summary; and (10) an investigative report.  *Id.* at §1.C.1.d.(1)-(10), at 1-3 (ECF No. 71-11 at 10).

In opposing the summary judgment motion, Plaintiff claims that in investigating his abuse claim, Lt. Grego violated Policy DC-ADM 001 multiple times,[9] and that

_____

[9] Plaintiff claims that he first received a copy of Lt. Grego's investigative report through discovery in this lawsuit.  (Pl.'s Aff. at 4; Pl.'s Opp'n Mem. at 15-16.)  From his review of that report, Plaintiff submits that Lt. Grego violated DC-ADM 001 by not interviewing him or providing him with an opportunity to provide a written statement (Pl.'s Aff. at 3); by not attempting to interview inmate witnesses and obtain inmate written statements after the interviews, despite the presence of inmate witnesses at the time of the incident as demonstrated by the yard video (Pl.'s Ex. K); by not interviewing all staff member witnesses and/or potential staff member witnesses and obtain staff written

Superintendent Gilmore read the report, knew that the investigation was a sham, and did nothing about it. Plaintiff submits that in doing so, Superintendent Gilmore failed to train, supervise and discipline Lt. Grego who failed to follow the policy. In support of his position, Plaintiff cites generally to his affidavit (Ex. A), his grievance and the investigative report, including the supporting documents (Pl.'s Ex. I), and to DC-ADM 001 Policy Statement and Procedures Manual for Investigation of Abuse Allegations (Pl.'s Ex. J).

The Court need not go into the details of each alleged violation by Lt. Grego[10] because there is no evidence to suggest Superintendent Gilmore knew of the alleged deficiencies in the investigative report at the time he reviewed it. In opposing summary judgment, Plaintiff argues that Gilmore had knowledge of the alleged violations because the cover page of the investigative report indicates that Gilmore received a

---

statements regarding Plaintiff's allegations of abuse; by not including all relevant medical documentation, or misconduct reports; by not commencing the investigation until 12/9/14 when his abuse complaint was filed on 10/8/14 for only 2 days.

[10] A comparison of Policy DC-ADM001 and the investigative report, and a review of Plaintiff's evidence, reveal no obvious deficiencies. However, Plaintiff attempts to create an issue of fact as to whether Lt. Grego attempted to interview him and obtain a written statement on 12/4/14 by denying this at his deposition on 11/16/15 (*see* Pl.'s Dep. at 37, ECF No. 66-1 at 132) and in his affidavit filed in support of his opposition to the summary judgment motion (*see* Pl.'s Aff. at 3). This is a red herring as the Court's analysis is only concerned with what Superintendent Gilmore would have known at the time he reviewed the investigative report, and Plaintiff has not produced any evidence to show that Superintendent Gilmore would have known that Plaintiff was claiming he was never interviewed based on the investigative report. "If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official." *Rogers v. United States,* 696 F. Supp. 2d 472, 488 (W.D.Pa. 2010).

copy of it.  From that, Plaintiff extrapolates that Gilmore read the report, saw it was a

sham, and chose not to employ that DOC policy was being followed.  In support,

Plaintiff relies primarily on his affidavit;[11] however, the statements in his affidavit upon

which he is relying are not based on personal knowledge, but rather, consist of

conclusory statements.  In particular, Plaintiff declares:

> On information and belief, [Robert Gilmore] does know
> there is a pattern of excessive force being practice (sic) at
> SCI-Greene, but fails to train, supervise, and discipline the
> culprits.
>
> Robert Gilmore knows there is a pattern of lack of
> investigation being practice (sic) at SCI-Greene, but fails to
> train, supervise, and discipline the culprits.
>
> On information and belief, there is a pattern of Robert
> Gilmore tolerating, encouraging, and acquiescing to
> deliberate indifference at SCI-Greene.
>
> After receiving the investigative report . . . , it is evident that
> DOC DC-ADM 001 Abuse Policy was violated multiple
> times. . . . Robert Gilmore failed to employ.  He failed to
> train, supervise, and discipline.  He was deliberately
> indifferent to my rights.

Pl.'s Aff. at 4-5.  These conclusory statements are not evidence.  *See Kirleis v. Dickie,*

*McCamey & Chilcote, P.C.,* 560 F.3d 156, 161 (3d Cir. 2009) ("'[C]onclusory, self-serving

affidavits are insufficient to withstand a motion for summary judgment.'") (quoting

*Blair v. Scott Specialty Gases,* 283 F.3d 595, 608 (3d Cir. 2002)).[12]

---

[11] Plaintiff also cites to the DOC Policies and the investigative report for support, but
they do not show that Superintendent Gilmore knew of any policy violations.

[12] *See also Cusamano v. Sobek,* 604 F. Supp. 2d 416 (N.D.N.Y. 2009) (Even where an
affidavit is nonconclusory, it may be insufficient to create a factual issue precluding

Even giving Plaintiff the benefit of all favorable inferences, a reasonable jury could not find that when Gilmore read the investigative report, he would have known it was a sham. The investigation gathered the required information and documents, was conducted over a seven-day period during which numerous interviews of witnesses were conducted and written statements obtained, all in accordance with Policy DC-ADM 001. Plaintiff fails to point to any evidence from which a reasonable jury could infer that at the time Gilmore read the investigative report, he knew or should have known it was a sham.

Nor could a reasonable jury find, based this record, that Superintendent Gilmore's alleged "toleration of policy violations is what encouraged Lt. Grego . . . to sham the investigation and try to cover up in a three day investigation." Pl.'s Opp'n Mem. at 18. Plaintiff has not produced any evidence that there was a pattern or practice of conducting sham investigations into allegations of inmate abuse. In his affidavit, Plaintiff submits that while he was housed in the RHU (Sept. 2014 to August 2015), other inmates told him that they experienced a lack of investigation after being subjected to excessive force, but were transferred out before he could obtain affidavits from them. (Pl.'s Aff. at 3.) This statement alone is insufficient to establish a pattern or

---

summary judgment where it possesses the following two characteristics: (1) it constitutes almost the sole or exclusive basis for a disputed issue of fact in the case, or, expressed differently, it is largely unsubstantiated by any other direct evidence, and (2) it is so lacking in credibility that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant because the testimony is incomplete and/or replete with inconsistencies and improbabilities).

practice of failing to investigate abuse allegations. Without more information, i.e., the names of the inmates involved, the dates of said occurrences, and a description of what transpired, it is impossible to know if the alleged occurrences took place prior to 9/20/14 and if they were sufficiently similar to Plaintiff's to suggest a pattern or practice of sham investigations.

Finally, Plaintiff has not produced any evidence to show that his injury was directly caused by any deficiencies in the investigation of his abuse complaint, nor can he. Any "actions or inactions that occur after the alleged [use of excessive force] had already been completed cannot be said to have been the 'cause' of Plaintiff's injuries. Without such causation, there can be no liability." *Armbruster v. Marguccio,* No. Civ. A. 05-344J, 2006 WL 3488969, *11 (W.D.Pa. Dec. 4, 2006) (citations omitted). Thus, a reasonable jury could not find that the alleged harm—the use of excessive force by Officer Barnhart and Officer Gillis's alleged failure to intervene, resulting in a broken arm—was directly caused by Superintendent Gilmore's failure to employ Policy DC-ADM001 on investigating abuse allegations.

With regard to Superintendent Gilmore's alleged failure to train and discipline Lt. Grego for failing to follow Policy DC-ADM 001, Plaintiff has failed to produce any evidence to establish deliberate indifference. When asked in his deposition what evidence he had that Superintendent Gilmore failed to train the other people involved, Plaintiff responded, "[b]ecause I believe if he did train them properly, that this wouldn't have happened. This wouldn't have occurred." Pl.'s Dep. at 36, l. 15-20.

"Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson,* 563 U.S. 51, 62 (2011)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick,* 563 U.S. at 62. Moreover, the identified deficiency in the training program "'[must have] actually caused' the constitutional violation." *Thomas,* 749 F.3d at 222 (quoting *Canton,* 489 U.S. at 391). In the case at bar, there is simply no evidence to show that Superintendent Gilmore was aware of any inadequacies in Lt. Grego or his training. Nor do the facts here show that an obvious need for specific training existed, as the record is devoid of any evidence (1) that Lt. Grego's training was inadequate, or (2) of a pattern of violations in the investigation of abuse claims similar to the ones alleged here. In addition, there is simply no evidence, but rather only speculation, that a lack of training in investigating abuse claims caused Defendant Barnhart to use excessive force on Plaintiff.

Similarly, the failure to discipline Lt. Grego cannot provide a basis for supervisory liability. The decision not to discipline Lt. Grego does not constitute active involvement in Plaintiff's injuries since Plaintiff's injury occurred before any decision not to discipline was made. *Ricker v. Weston,* 27 F. App'x 113, 119 (3d Cir. 2002).

Therefore, Plaintiff's claim of deliberate indifference based on a failure to train or discipline Lt. Grego must fail.

Accordingly, the Court concludes that based on the summary judgment record, a reasonable jury could not find that Superintendent Gilmore was deliberately indifferent to his subordinates' investigation of the 9/20/14 incident.

### b. Policy on Use of Force

Plaintiff argues that DC-ADM201 Use of Force Policy is exact when stating the reasons when it is necessary for a staff member to apply force, and that it is not appropriate as a means of punishment or revenge. The relevant part of Policy DC-ADM 201 provides:

The DOC Policy Statement on the Use of Force provides that the "[u]se of force against an inmate is authorized when the acting staff member reasonably believes such force is necessary . . . [for the] protection self or others; . . . [for the] prevention of an act of crime; [and to] effect compliance with the rules and regulations when other methods of control are ineffective or insufficient; . . .." DC-ADM 201, Use of Force Policy Statement, Section III, Part A, ¶¶1, 5, & 6 (ECF No. 71-13 at 2-3). The Policy Statement further provides that "[w]hen force is used, the least amount of force the staff member reasonably believes is necessary to achieve the authorized purpose is to be used and the use of force will stop once control is achieved. *Id.* at Section III, Part B (ECF No. 71-13 at 3)(footnote omitted). In addition, the Policy Statement provides that "[f]orce is not

authorized as a means of punishment or revenge."  *Id.* at Section III, Part D (ECF No. 71-13 at 3 (footnote omitted).

The accompanying DOC Procedures Manual provides, in relevant part:

**Section 1 – General**
. . .

**B.      Instruments of Restraint**

1.      [I]nstruments of restraint may only be used as a precaution against escape or as a precaution against an inmate injuring him/herself or others.  The application of restraints shall not be used as a punitive sanction, for the sole purpose of inflicting pain, or for the purpose of exposing inmates to public ridicule.

DC-ADM 201 Procedures Manual on Use of Force, ("Use of Force Procedures Manual") at 1-1 to 2-1 (ECF No. 71-13 at 9-10).  In the above procedures manual, the term "Facility Manager" means the Superintendent of a State Correctional Facility.  *See* Use of Force Procedures Manual—Glossary of Terms (ECF No. 71-13 at 11).

Plaintiff submits that due to lack of training, supervision, and discipline, Officer Barnhart abandoned this policy by maliciously breaking his arm while he was handcuffed, then squeezing the handcuffs afterwards to cause even more pain.  (Pl.'s Opp'n Mem. at 14.)   Plaintiff further argues that Superintendent Gilmore "redundantly" failed to train, supervise, and discipline his subordinates, failed to ensure that the Use of Force Policy was followed, and that this failure and tolerance encouraged Officer Barnhart and the other defendants to violate Plaintiff's right and inflict injury.  (*Id.* at 14, 17, citing Pl.'s Exs. A, C, F, K, & L.)  In addition, Plaintiff

submits that Superintendent Gilmore tolerates, encourages, and acquiesces to a practice of excessive force at SCI-Greene and it shows in a pattern.  (*Id.* at 19, citing Pl.'s Exs. A, N, & O.)

Plaintiff attempts to argue that Superintendent Gilmore had knowledge that Officers Barnhart and Gillis were not following the Use of Force Policy because of past occurrences at SCI-Greene and that he acquiesced in the alleged violations by failing to address these violations through training and discipline.  In support, Plaintiff proffers the affidavits of two inmates who he claims experienced similar violations at SCI-Greene.  *See* Pl.'s Exs. N & O (ECF Nos. 71-15 & 71-16).  Defendant Gilmore argues, on the other hand, that Plaintiff has offered nothing but unsubstantiated speculation that Superintendent Gilmore failed to train or supervise anyone, and there was no need for any discipline as the investigation exonerated Officers Barnhart and Gillis.  As to the two affidavits submitted as proof of a pattern that excessive force was tolerated, Superintendent Gilmore submits that two unrelated allegations of excessive force at wide intervals do not show a pattern of excessive force.  (Def.'s Resp. to Pl.'s Concise Stmt. of Undisputed Material Facts at ¶15, ECF No. 76 at 3.)  Moreover, Superintendent Gilmore contends that while the affidavits allege that excessive force was used, the DOC documents do not support the allegations.  (*Id.*)

In this Circuit, "supervising officials 'must have played an affirmative role in the deprivation of the plaintiffs' rights[;] . . . the officials' misconduct cannot be merely a failure to act.'"  *Cinchello*, 805 F.2d at 133 (quoting *Commw. of Pa. v. Porter*, 659 F.2d 306,

336 (3d Cir. 1981)).  Those courts of appeals who have inferred supervisory approval of unconstitutional conduct from inaction on the supervisor's part "have found liability only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id.* (citations and footnote omitted).

The Court finds that the affidavits produced as Exhibits N and O (ECF Nos. 71-15 & 71-16) do not present sufficient evidence from which a reasonable jury could find that a pattern of using excessive force existed at SCI-Greene.  The alleged incidents of excessive force upon which Plaintiff relied occurred in April and June of 2015, well after the alleged abuse to Plaintiff on 9/20/14.  Thus, these affidavits do not provide proof of a pattern of similar incidents occurring prior to 9/20/14.  Nor do the affidavits provide proof that Superintendent Gilmore possessed contemporaneous knowledge of the 9/20/14 incident.  In addition, the record does not contain any other evidence that Superintendent Gilmore had contemporaneous knowledge of the 9/20/14 incident.  Therefore, the Court finds that Plaintiff has failed to establish a pattern or practice of tolerating the use of excessive force in circumstances similar to Plaintiff's at SCI-Greene.

With regard to Plaintiff's failure to train on the use of force, Superintendent Gilmore argues that Plaintiff has failed to produce any evidence to support his bald speculation that there was a failure to train the officers.  In support, Gilmore points to Plaintiff's deposition where, when asked what is the basis for his claim that

Superintendent Gilmore failed to properly train his subordinates, Plaintiff stated only that if Superintendent Gilmore had trained them properly, the incident in which his arm was broken would not have occurred, "plus, . . . I was around other people where they've been injured in a similar way and it's like a pattern, like, that's going on . . . excessive force." Pl.'s Dep. at 36-37. As noted above, "[o]rdinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train." *Thomas*, 749 F.3d at 223 (citation omitted). In the case at bar, there is simply no evidence to show that Superintendent Gilmore was aware of any deficiencies in Officer Barnhart's and Officer Gillis' application of the use of force policy or their training. As the record is devoid of any evidence (1) that the officers' training was inadequate, or (2) of a pattern of violations in the use of force policy similar to the one alleged here. Nor do the facts here show that an obvious need for specific training existed. There is simply no evidence, but rather only speculation, that a lack of training on the use of force caused Officers Barnhart and Gillis to use excessive force on Plaintiff.

Finally, Defendant Gilmore moves for summary judgment on Plaintiff's failure to discipline claim on the basis that the investigation exonerated the correctional officers who escorted him, and therefore, there was no need to discipline them. The Court finds that Superintendent Gilmore's failure to discipline Officers Barnhart and Gillis cannot provide a basis for supervisory liability. The decision not to discipline Officers Barnhart and Gillis does not constitute active involvement in Plaintiff's injuries since Plaintiff's

injury occurred before any decision not to discipline was made.  *Ricker,* 27 F. App'x at 119.  Therefore, Plaintiff's claim of deliberate indifference based on Superintendent Gilmore's failure to train or discipline Officers Barnhart and Gillis must fail.

Accordingly, the Court concludes that based on the summary judgment record, a reasonable jury could not find that Superintendent Gilmore was deliberately indifferent to Officers Barnhart and Gillis alleged use of excessive force in the 9/20/14 incident.

IV.    **CONCLUSION**

For the reasons set forth above, the Court will grant Defendants' Motion for Summary Judgment in favor of Defendants Durco, Gilmore, and Does Nos. 4, 5, and 6. An appropriate order will follow.

Dated:  September 30, 2016                                   BY THE COURT:


_____
LISA PUPO LENIHAN
United States Magistrate Judge


cc:    Jamar Wilson
       JM8436
       175 Progress Drive
       Waynesburg, PA  15370
       *Via First Class, U.S. Mail*

       All Counsel of Record
       *Via CM/ECF Electronic Mail*